# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs June 22, 2010

## STATE OF TENNESSEE v. ROBERT A. GUERRERO

**Direct Appeal from the Circuit Court for Maury County**
**No. 17884     Stella Hargrove, Judge**

**No. M2008-02839-CCA-R3-CD - Filed June 8, 2011**

Defendant, Robert A. Guerrero, was indicted by the Maury County Grand Jury on two counts of first degree murder, two counts of felony murder, nine counts of attempted first degree murder, and nine counts of aggravated assault. Following a jury trial, Defendant was convicted of two counts of first degree murder and nine counts of attempted first degree murder. Defendant was sentenced by the trial court to two consecutive life sentences and nine fifteen-year sentences, to run consecutive to the life sentences, for a total effective sentence of two life sentences plus 135 years. In this direct appeal, Defendant makes the following assignments of error: 1) the trial court erred by denying Defendant's challenges for cause to three jurors; 2) the trial court erred by not allowing Defendant to conduct an individual voir dire of the prospective jurors regarding their media exposure to the case; 3) the trial court erred by not striking three jurors after they saw Defendant being escorted to the restroom by a courtroom deputy; 4) the trial court erred in allowing a witness for the State to remain in the courtroom in violation of Tennessee Rule of Evidence 615; 5) the trial court erred by allowing the testimony of an emergency room doctor who treated some of the victims; 6) the trial court erred by allowing two exhibits into evidence over Defendant's objection as to the chain of custody; 7) the indictments charging attempted first degree murder, Counts 5 through 9, should have been dismissed for failing to provide Defendant adequate notice of the charge; 8) the trial court erred by instructing the jury on criminal responsibility; 9) the trial court erred by imposing consecutive sentencing; 10) the evidence was insufficient to support Defendant's convictions. Following a careful review of the record on appeal, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Robert A. Guerrero.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; T. Michel Bottoms, District Attorney General, and Kimberly Cooper, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

*Facts*

On April 12, 2008, several hundred people attended a Quinceanera, "Sweet 15" birthday party, at the National Guard Armory in Columbia, Tennessee. One of the victims, Jose Castro, testified that while he was at the party, a fight broke out, and police were called to the scene and people were escorted out of the building. Mr. Castro testified that he was involved in the fight and that he saw Defendant there with three other men. One of the men with Defendant was a black male wearing an orange shirt and orange shoes. Mr. Castro left the party with ten others, including his girlfriend, Sarah Garcia, seated in the front passenger seat; Carlos Landauro, Patricia Garcia (Sarah's sister), Jonathan Trugas, and Jose Valadiz, all seated in the second row seat; and Mr. Castro's older brother, Leonizio Santas, his ten-year-old brother, Juan Castro, Jason Castro, Jonathan Zaragoza, and Dalila Cortinas, all seated in the rear area of Mr. Castro's Ford Expedition SUV.

On the way home, Mr. Castro noticed that the vehicle behind him was repeatedly speeding up and slowing down. The driver of the car following him then turned off the headlights. Mr. Castro told everyone in his vehicle to duck down because the "car behind [him] was acting suspicious." He testified that the car pulled up beside him and he heard gunshots. Mr. Castro testified that it was too dark for him to see the color of the vehicle or the people inside. He "just saw sparks." Mr. Castro was shot in his upper thigh and his "body went numb." He began "swerving and hitting the car to run it off the road." The other driver appeared to have lost control of his vehicle. Mr. Castro drove to the Williamson County Medical Center. He testified that on their way to the hospital, Sarah Garcia told him that she had been shot in the leg, and Juan Castro said that he had been "hit."

Sarah Garcia testified that she and her sister, Patty Garcia, went to the party at the Armory with Mr. Castro. She testified that many people were involved in the fight, and there was a lot of breaking bottles and throwing chairs. She did not recall seeing Defendant at the party, but she saw his co-defendant Javoris Sparkman, and she testified that he was wearing bright orange clothing. While riding home in Mr. Castro's vehicle, she also saw the car behind them, with its lights off, pull up beside the driver's side and then gunshots were fired from that vehicle into the Castro vehicle. She testified that the gunshots "just didn't stop,"

and they were coming from the front passenger side of the vehicle. She laid down on Mr. Castro's lap and closed her eyes. She was shot in the leg. She testified that two other passengers screamed that Mr. Castro's brother Juan had been shot and he was not responding. Her sister Patty had also been shot and was also not responding. Sarah Garcia testified that she was hospitalized for ten days and had two or three surgeries to repair her injury.

Carlos Landauro attended the party at the Armory and left with Jose Castro. He testified that he did not see the fight because he had gone to the store to buy beer. When he returned to the party, he saw police officers everywhere, and he saw a black male wearing an orange shirt trying to push officers away. Mr. Landauro was seated in the back seat behind Jose Castro. He testified that he saw sparks from gunfire and he ducked down. He was not shot, but Patty Garcia, who was sitting beside him, slumped down and was unresponsive.

Jason Castro, Jose Castro's ten-year-old brother, attended the party with his parents and brothers and left with Jose. He sat in the rear area of the SUV. He testified that he turned around in the vehicle and saw a white car behind them while they were stopped at a stoplight. He then heard gunshots and saw gunfire, and he ducked down. He testified that his brother Juan Castro was shot. Following the incident, Jason gave a statement to Detective Alsup that someone had gotten in his father's face at the party, and his brother Juan tried to separate them. He also stated that his brothers Juan and Jose hit someone during the fight.

Emergency room physician Dr. Jerry Edwards testified that when the victims arrived at the Williamson County Medical Center in the early morning hours of April 13, 2008, he helped Sarah Garcia out of the vehicle. She was bleeding profusely from her left leg. Juan Castro and Patty Garcia were brought into the hospital in full cardiac arrest. Patty Garcia had been shot in the head, and Juan Castro had been shot in the chest. Both victims died. Dr. Edwards also treated Jose Castro, who had been shot twice in his leg.

Forensic pathologist Amy McMaster performed the autopsies on Patty Garcia and Juan Castro. She testified that Patty Garcia died from a gunshot wound to her head. Juan Castro had three gunshot wounds, two to his back and one to his shoulder. Two bullets were recovered from Mr. Castro's shoulder and chest. A third bullet that had entered Mr. Castro's back and then exited his chest was not recovered but it produced the fatal wound.

Officer Jeremy Humphrey of the Columbia Police Department responded to a call at the scene of the shooting. He testified that when he arrived, he saw shattered glass on the highway and an orange shoe lying on the road. He saw Defendant and another male standing beside a vehicle that was in the ditch. Defendant told Officer Humphrey that they had been

-3-

in a fight at the Armory and another vehicle had run them off the road. He said the other vehicle was an SUV. Officer Alex McPherson also responded to the scene and discovered a rifle lying near the front of the vehicle. Defendant and the other male were immediately detained and placed under arrest. Officer McPherson testified that the weapon was an "SKS" assault rifle with a collapsible stock, which means that it can be fired like a handgun. In the gun there was a magazine containing two bullets. Officer McPherson photographed the weapon and logged it into evidence at the police department.

Detective Jeremy Alsup interviewed Defendant at the police department on April 16, 2008. Detective Alsup testified that Defendant also gave a written statement in which he denied having been involved in a fight at the Armory. Defendant stated that one of the victims had approached him and tried to hit him and that Defendant and his two friends were escorted out of the party by police. They waited outside with another friend and then left together. After leaving, he saw the victim's vehicle, and he stated that he handed "Chas" a .38 handgun and that "Chas" passed "Bodie" the SKS out of the trunk, and when they got beside them, "they opened fire." The vehicle then wrecked, and "Bodie and Chas" ran, and Defendant and his cousin stayed at the scene. In his statement, Defendant admitted "I understand what we did was wrong, but all I can do is pray and beg for another shot at life and to let me take care of my family, please. I am not a murderer."

Corrections officer Daryl Bailey testified that he found a letter in co-defendant Javoris Sparkman's jail cell at the Maury County Jail. He gave the letter to Detective Andy Jackson. Although Detective Jackson testified that he believed he gave the letter to Detective Cash, Detective Alsup testified that he was contacted by Detective Jackson on May 7, 2008, and he later went to the Maury County Sheriff's Department and received the letter from Detective Jackson. The letter was sent along with Defendant's earlier written statement to the FBI lab for analysis.

The letter found purportedly written by Defendant stated:

> You got me f[ ]ed up bro, I didn't even want to give no statement until I talked to a lawyer that's why they kept me in the front, so I couldn't talk to little Eric and get our sh[ ] together. You act like you got away and I told on you. We left the damn chopper right next to the car. Me and E stayed looking for the gun. When they pulled up on us after you turned yourself in they questioned me and I tried to lie and say we were taking E home to the creek. And they hit us first before we started dumping, but they already knew everything from me giving Chase the gun to me saying light them up. As I started to speed up I didn't say sh[ ]. So f[ ]k what you talking about.

-4-

That's some ho-a[ ]-sh[ ] for you to think like that after everything. I f[ ]ed
with you fool, but f[ ]k it, I guess you can think what you want.

Peter Belcastro, Jr., a forensic handwriting examiner for the FBI, testified that he compared the written statement given by Defendant with the letter taken from co-defendant Sparkman's cell, and in his opinion, Defendant "prepared a majority of the questioned writing on the [letter]." He testified that there were "areas [of the] document that [he] could not identify and those areas would consist of over-writing, or scribbled writing, areas where there's not enough clarity and detail to make an assessment of who prepared it." Mr. Belcastro testified, however, that an "overwhelming majority" of the letter was written by Defendant.

Detective Alsup was present for the two deceased victim's autopsies. There were two bullets that were recovered from Juan Castro and one from Patricia Garcia. Detective Alsup requested that those bullets and the bullet recovered from Sarah Garcia's leg be sent to the TBI crime lab for analysis and comparison to the rifle that was recovered from the scene of the shooting.

Detective Cory Cooper testified that there were no weapons found in the victim's vehicle. He also testified that a .38 caliber weapon was never recovered in the investigation of this case. He responded to the scene of the shooting and saw a gold-colored Pontiac Grand Prix in a ditch and glass on the road. He took photographs of the vehicle and damage along the passenger side. He also collected orange-colored paint chips from the front passenger seat of the vehicle that were consistent with the color of the victim's SUV, and he sent the paint chips collected and samples taken from the victim's vehicle to be analyzed and compared. Miranda Terry of the TBI compared the paint samples under microscopic evaluation and determined that they were consistent.

Detective Jeff Duncan photographed and collected evidence from the victim's vehicle and obtained a DNA sample from Defendant by search warrant, which he logged into evidence. He testified that there were nine bullet holes in the side of Mr. Castro's SUV, and he recovered two bullets from the inside of the vehicle.

Steve Scott, of the TBI crime lab firearms identification unit, testified that he examined the rifle and multiple bullets that were recovered in this case. He testified that the rifle used was a high-powered, semi-automatic weapon that was capable of penetrating a vehicle. He concluded that the bullet recovered from Sarah Garcia had been fired from the rifle. He also examined the bullet recovered from Patricia Garcia and two bullets recovered from Juan Castro, the deceased victims, and he concluded that they were fired from the same

firearm, but not the rifle submitted for analysis. He testified that those bullets were fired from a .38 caliber handgun.

Mark Dunlap of the TBI crime lab compared DNA profiles collected from the rifle found at the scene with Defendant's DNA sample and determined that the rifle was handled by three people. He tested several components of the rifle, including the grip, forearm, stock, bolt, magazine and strap for touch DNA and found a mixture of three people's DNA. He testified that Defendant was a "major contributor" in that his DNA was found in the highest levels on the grip of the rifle. He also determined that Defendant was a "minor contributor" to the forearm and strap of the rifle. The trigger of the rifle was also tested, but there was an insufficient DNA profile to determine to analyze.

Defendant testified that he was at the party at the Armory that night. He had known co-defendant Javoris Sparkman ("Bodie") for six years and co-defendant Charles Kelly ("Chas") for one year. His co-defendant Eric Guerrero is his cousin. All four men went to the party together. Defendant testified that they had gone to the party earlier that night and left, and after they returned, they were not there long before the party broke up. He testified that they walked in and "it looked like a riot." There were broken bottles and chairs everywhere. Defendant testified that his grandfather, who was also at the party, had been hit in the mouth, although Defendant did not see the person who hit his grandfather. After the police arrived, Defendant was trying to leave through the back door when someone from the victim's family tried to grab him. Javoris Sparkman grabbed that person and told him to "chill out" and "back up." They were then escorted out the front door by police officers and told to leave.

Defendant testified that he did not know any of the victims before that night. Defendant was told that one of the victims had hit his grandfather. Defendant saw the victims leave in Mr. Castro's Ford Expedition, and he pulled away behind them. Defendant was driving, Chas was in the back passenger seat, Javoris Sparkman was in the front passenger seat, and Eric Guerrero was behind the driver's seat. He testified that they caught up to the victims' vehicle and pulled up beside it. He testified that he "wasn't in [his] right mind" because of what he had seen happen to his grandfather. Defendant was carrying a .38 caliber revolver "on [him]" and that he had an SKS assault rifle in his trunk, but he did not know who the rifle belonged to. Defendant claimed that he did not know why the rifle was in his trunk, but he was the only one who knew it was there. He testified that as they followed the victims' vehicle, he and his co-defendants did not discuss what they were going to do because "it was understood what was going on." As they pulled up to the victims' vehicle, Defendant told the others that there was a rifle in the trunk. Defendant's vehicle had a pass through between the trunk and the back seat. Someone in the back seat passed the rifle to the front, and Defendant gave his .38 to Chas because, he testified, Chas asked for it.

-6-

Defendant testified that he did not know how many people were in Mr. Castro's vehicle. He testified,

> We didn't think that there was that many people in the vehicle, . . . .
> We just seen bald heads jumpin' in there. We seen the guys that was involved in the fight. We didn't seen none of them, all the women that was in the vehicle. I mean, if we would have known there was all them women in the vehicle, I mean, come on, you know, I mean, you can't, it wouldn't have happened the way, you know, it was all messed up. That was all wrong.

Defendant admitted that he wrote the letter to Javoris Sparkman, and he admitted that he had lied to detectives about the events of that night. He testified that he did not remember telling anyone to "light 'em up," and he thought that phrase had been "put in his head" by the detectives. Defendant denied that he shot any of the victims. Defendant testified, however, that he sped up in order to keep up with the victim's vehicle and that Sparkman and Charles Kelly fired upon the vehicle.

### *Issues*

#### I.       *Challenges for cause to potential jurors*

Defendant contends that the trial court erred in denying his challenges for cause as to three of the jurors at trial.

Tennessee Rule of Criminal Procedure 24(c) governs challenges to potential jurors for cause. It states, in pertinent part, "Any party may challenge a prospective juror for cause if . . . there exists any ground for challenge for cause provided by law; [or] the prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." Tenn. R. Crim. P. 24(c). The trial court is granted broad discretion in deciding the manner in which voir dire will be conducted, and its decisions in this regard will not be disturbed on appeal absent a showing of abuse of discretion. *See State v. Stephenson*, 878 S.W.2d 530, 540 (Tenn. 1994). Moreover, unless there has been a clear abuse, the trial court's discretion in determining the qualifications of jurors is not subject to review. *See Lindsey v. State*, 189 Tenn. 355, 366-67, 225 S.W.2d 533, 538 (1949).

During voir dire, Juror Thurman stated that he had heard of this case in the media and had discussed the case with his wife because they lived near the location of the shooting. Juror Thurman also answered affirmatively that he had not formed an opinion as to the guilt or innocence of Defendant and that he could set aside any thoughts or preconceived notions

-7-

about the case and base his decision solely on the evidence presented at trial. The trial court denied Defendant's challenge for cause, ruling as follows:

> Mr. Thurman, I thought was very forthcoming in his answers. He says he heard something on the radio as well as seen [sic] something in the newspaper and on television. So he's been exposed to three sets of media. The fact that he does live on the Nashville Highway, I guess, would kind of create maybe a more personal interest, this location in and of itself. But, he says this wasn't near his home. He did use the word "ambush," and I heard that too, [Defense Counsel], but he went direct to his concern about drive-by shootings and talked about Nashville, I think and did not talk specifically about this case.

Defendant also challenged for cause Juror Callahan. During voir dire, Juror Callahan, when questioned about his knowledge of the case, stated that he had heard about the incident when it first happened and read an article in the prior day's newspaper, which had refreshed his memory of the incident. He stated that he felt "uneasy, a little bit" and that he had "mixed emotions about it." Juror Callahan answered affirmatively that he believed he could set those feelings aside and base his decision solely on the evidence.

The trial court denied Defendant's challenge to Juror Callahan, finding that:

> [H]e probably gave the most honest answers [the court has] heard today, he said he tried not to form an opinion, he has mixed emotions. He did say that he could set aside everything that he has read and base his opinion from what he heard from the courtroom and I thought he was forthcoming about that.

Finally, Defendant challenged Juror Peek, who stated that she read about the case in the newspaper. When asked whether she could set aside what she had heard or read about the case and base her decision only on the evidence, she responded, "I think I could." Defense counsel questioned Juror Peek as follows:

> Q. [. . . .] Do you think you have formed an opinion on this case?
>
> A. I don't think I have formed an opinion, I don't know anybody, so.
>
> Q. But, probably have given it some thought?
>
> A. No.

* * * *

Q.     [. . . .] Can you assure the court that if there to happen [sic] that you're confident that you cannot have any influence from anything else you're heard, or seen in the case?

A.     I believe I could.

The trial court denied Defendant's challenge to Juror Peek. The court noted,

Well, I think we asked these people some hard questions, you know, these are questions they've never considered in their whole life. And I think she answered honestly. She did say she's not formed an opinion. She did hesitate at first, she didn't say either way, but she eventually said she had not and she believed that she could be fair.

We recognize that "[t]he trial court, rather than the appellate court, is clearly in the better position to observe the demeanor, attitude, and body language of a potential juror from which the court may conclude the potential juror's capability of impartiality." *State v. Lorenzo Malone*, No. M2003-02770-CCA-R3-CD, 2005 WL 1521788, at *3 (Tenn. Crim. App., June 27, 2005), no perm. app. filed.

We conclude that Defendant has failed to show any clear abuse of discretion by the trial court. Further, Defendant has failed to show how he was prejudiced by the alleged error. "[I]rrespective of whether the trial judge should have excluded the . . . challenged [jurors] for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993). Defendant is not entitled to relief on this issue.

II.     *Individual voir dire of prospective jurors*

Defendant asserts that the trial court erred by not allowing individual voir dire of the prospective jurors regarding specific information they heard from the media about the case.

The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial. *State v. Cazes*, 875 S.W.2d 253, 262 (Tenn. 1994); *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993). The prevailing practice is to examine jurors collectively. *State v. Austin*, 87 S.W.3d 447, 471 (Tenn. 2002); *State v. Oody*, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991); *State v. Hopper*, 695 S.W.2d 530, 539 (Tenn. Crim. App. 1985). "Individual voir dire is mandated only when there is a 'significant possibility' that a juror has been

exposed to potentially prejudicial material." *Austin*, 87 S.W.3d at 471-72 (quoting *State v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992)). People do not live in isolation. To expect that a prospective juror has not had any level of pretrial exposure to the facts of a case is unreasonable, and mere exposure of jurors to media does not itself constitute constitutional error. *State v. Hugueley*, 185 S.W.3d 356, 390 (Tenn. 2006); *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The decision regarding the individual voir dire of prospective jurors remains within the sound discretion of the court, and will not be reversed on appeal absent a finding of "manifest error." *Howell*, 868 S.W.2d at 247-48.

Defendant asserts that it was manifest error for the trial court not to allow individual voir dire of the prospective jurors regarding specific information they heard in the media or otherwise about the case. We disagree.

Defendant acknowledges that the trial court allowed voir dire of smaller groups, "up to two or three people at a time," of prospective jurors to be questioned about what they had seen, heard or read in the media, but complains that the trial court denied his request to talk to each individual juror about what specific information they had been exposed to and what was the source of that information.

We note that the trial court excused several jurors for cause who indicated that they could not be fair and impartial. We do not believe that the way in which the trial court allowed voir dire was manifest error or an abuse of its discretion. Therefore, Defendant is not entitled to relief on this issue.

## III.    *Failure to strike jurors*

For Defendant's third assignment of error, he complains that the trial court failed to strike three jurors after they reportedly saw Defendant being escorted to the restroom by uniformed officers during a courtroom break. The record shows that during a break in voir dire, Defendant's counsel asked a court deputy to escort Defendant to the restroom. As the deputy was escorting Defendant out of the courtroom, prospective jurors were escorted into the courtroom and seated in the jury box. Defense counsel moved to have the three prospective jurors in the courtroom at that time removed from the jury venire, and the trial court denied the motion. The trial court stated:

> Well, before we took a break we knew that four jurors would be coming down. And everybody knew that. And we have to be cautious and that includes [Defense counsel]. You knew they were going to be in here. And I understand that it was just everything came at one time. I understand that. We do the best we can. Our courtroom is laid out so that it's difficult.

-10-

We've been careful all morning in trying to transport Mr. Guerrero here, to make sure that the jurors did not know he was in custody.

Of course it's not unusual to have somebody charged with first degree murder held without bond, in custody. I mean, that's not unusual. It's also, in my mind, not unusual to have somebody go to the bathroom with a person charged with a serious crime, for his own protection.

Particularly, when you've got all these people in the courtroom as spectators. And so, the Court does not agree with [Defense counsel]. I think that everybody here is responsible for what happened and I think it's something that we can't really place the blame on one particular person. We're all going to have to be careful.

But, I am going to keep these three jurors.

In his brief, Defendant complains that he was deprived of his right to a fair trial and his right to a presumption of innocence, citing cases in which defendants were forced to stand trial while wearing prison clothes or shackles. *See e.g. Estelle v. Williams*, 425 U.S. 501, 504, 96 S.Ct. 1691, 1692-93 (1976). In this case, Defendant was not handcuffed, shackled or wearing prison clothing during the trial. This Court has held that no prejudice results from a jury's "incidental" sighting of a defendant in handcuffs or prison attire while he is being transported to and from the courthouse. *State v. Baker*, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987); *State v. Charles Wade McGaha*, No. E2006-01984-CCA-R3-CD, 2008 WL 148943, at *9 (Tenn. Crim. App. at Knoxville, Jan. 16, 2008), *perm. app. denied* (Tenn. June 23, 2008).

In *Baker*, this Court reasoned:

Common sense must prevail in such instances where a jury or jurors inadvertently see a defendant dressed in prison clothing. Reason dictates that they must know a person on trial is either on bail or in confinement during the course of a trial. The evidence of the guilt of all the defendants in this case was strong. There is no indication that any of them were prejudiced by the occurrence complained of.

Accordingly, Defendant is not entitled to relief on this issue.

IV.    *Rule of sequestration*

Defendant complains that the trial court erred by allowing Detective Alsup to remain in the courtroom during the course of the trial, after Defendant requested the rule of sequestration of witnesses.

Rule 615 of the Tennessee Rules of Evidence provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

Tenn. R. Evid. 615.

The purpose of the rule of sequestration is to prevent a witness from hearing testimony of another witness and adjust his testimony accordingly. *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992). The "rule" may be invoked at any time and is mandatory. *State v. Anthony*, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

The sanctions for violations of the rule can vary. A trial judge may declare a mistrial or preclude a witness from testifying in the most egregious cases. *State v. Anthony*, 836 S.W.2d at 605. However, in other cases, the witness may be subjected to cross-examination on the violation, and the jury may be instructed to consider the violation in assessing the witness' testimony. *Id*. When the issue of a violation of the "rule" is raised on appeal, this court is to consider the seriousness of the violation and the prejudice, if any, suffered by the defendant. *See Harris*, 839 S.W.2d at 68-69; *Anthony*, 836 S.W.2d at 605.

After the jury was impaneled, but before opening statements, Defense counsel requested the rule of sequestration, and the trial court invoked the rule, instructing all witnesses to leave the courtroom. The following exchange was then had:

[Prosecutor]:     Does our officer have to leave, he's a prosecutor?

The Court:                  [Defense counsel]?

[Defense counsel]:   Judge, it's typically my preference that if the prosecuting officer is going to be a witness that he testify first.

The Court:                  Is he going to testify?

[Prosecutor]:           Well, we've got some doctors that have come that are going to have to testify, first, but he'll be early on, but we will need him to help sift through the evidence, because he's in charge of the entire case. And his testimony will be more understandable at a later time.

The Court:                  He was in charge of the case from the get go?

[Prosecutor]:           Right. Everybody filtered their evidence to him, primarily. He went to Williamson County Hospital, initially and he was up there through most of the initial investigation. Other members, he was in charge and they filtered their reports to him.

The Court:                  And you need him for what reason now?

[Prosecutor]:           Where there are voluminous exhibits, some of which we intend to use and many of which we do not and it would be very helpful to have him here to help us get the right ones.

The Court:                  I'll allow him to stay.

The transcript of the evidence shows that 12 witnesses for the State testified before Detective Allsup testified. Rule 615 does not authorize the exclusion of witnesses "whose presence is shown by a party to be essential to the presentation of the party's cause." We do not believe that the trial court violated Rule 615 by allowing Detective Allsup to remain in the courtroom during the other witnesses' testimony. Moreover, Defendant has failed to show how he was prejudiced even if there was error. The purpose of the rule is to prevent a witness from changing or altering his or her testimony based on testimony heard or facts learned from other testifying witnesses. *State v. Bane*, 57 S.W.3d 411, 423 (Tenn. 2001) (concluding that the trial court erred by not allowing the defendant's expert witness to remain

-13-

in the courtroom, but that the error did not affect the outcome to the defendant's prejudice). We find nothing in the record to suggest that Detective Allsup changed his testimony based on the testimony of the other witnesses. Accordingly, this issue is without merit.

*V.     Relevance of the evidence*

Defendant argues that the trial court erred by allowing the testimony of emergency room physician, Dr. Edwards, as to the treatment and status of the deceased victims because the pathologist was available to testify about the autopsy and the cause of death. Defendant asserts that Dr. Edwards' testimony was prejudicial and should have been excluded.

Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, Tenn. R. Evid. 402, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The determination of whether evidence is relevant lies within the sound discretion of the trial court. *State v. Hill*, 885 S.W.2d 357, 361 (Tenn. Crim. App. 1994). This Court will not interfere with the exercise of this discretion unless it appears on the face of the record that the trial court clearly abused its discretion. *State v. Hayes*, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995).

Defendant concedes the relevancy of at least some part of Dr. Edwards' testimony, but argues that his testimony was cumulative to the testimony of the pathologist who performed the autopsies on the deceased victims. Defendant also argues that Dr. Edwards' testimony was prejudicial in that some of the victims' family members could be heard crying in the courtroom during the testimony. Defendant objected to Dr. Edwards' testimony, and the trial court overruled his objection. Defendant later moved for a mistrial, and the trial court ruled as follows:

> The Court:     All right. The Court did rule from the bench and I will say that the Court finds the testimony of the ER, Dr. Edwards, relevant in all respects and finds that the probative value of his testimony outweighs any prejudicial effect.
>
> The Court prior to even beginning today, late yesterday asked the family to move back to, at least, three or four rows in the courtroom and they have done so. The Court was able to hear

-14-

some sobbing that was not extreme, as [Defense counsel] said, that was short lived and stopped once we broke the momentum and [Defense counsel] approached the bench. So that is the ruling of the Court and the motion for mistrial is denied.

Dr. Edwards was working at the Williamson County Medical Center emergency room when the victims arrived. He testified as to Sarah Garcia's injuries and his immediate care for her injuries, which included helping her out of the vehicle and trying to stop the profuse bleeding from her leg. He testified that Patricia Garcia had arrived in full cardiac arrest. She had a gunshot wound to the head. He testified that his treatment for Patricia Garcia included intubation, chest compressions, medications, and other measures, but his attempts were unsuccessful. Dr. Edwards was the physician who pronounced her dead. Dr. Edwards testified that Juan Castro had been shot in the chest, and he also arrived in full cardiac arrest. Dr. Edwards assisted in treating Mr. Castro and was present when he was pronounced dead. Dr. Edwards also treated Jose Castro's injuries, which included gunshot wounds to his leg.

We conclude that the trial court did not abuse its discretion in finding that Dr. Edwards' testimony was relevant. Testimony regarding the victim's injuries and deaths certainly tends to make the existence of a fact of consequence to the determination of the action more probable. We do not believe that danger of unfair prejudice resulting from the testimony substantially outweighs its probative value, nor is the testimony a needless presentation of cumulative evidence as the pathologist could testify only as to the deceased victim's causes of death and not the surviving victim's injuries. Defendant is therefore denied relief on this issue.

## VI.    Chain of custody

Defendant asserts that the trial court erred by allowing into evidence the letter handwritten by Defendant and the bullet recovered from the victim Sarah Garcia's leg. Defendant contends that the State did not properly show the chain of custody for both exhibits.

Before tangible evidence may be introduced, the party offering the evidence must either call a witness who is able to identify the evidence or must establish an unbroken chain of custody. *State v. Holloman*, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992). "However, the failure to call all of the witnesses who handled the evidence does not necessarily preclude its admission into evidence." *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998). Indeed, the identity of tangible evidence need not be proven beyond all possibility of doubt, and all possibility of tampering need not be excluded. *State v. Woods*, 806 S.W.2d

205, 212 (Tenn. Crim. App. 1990). Rather, "[i]t is sufficient if the facts establish a reasonable assurance of the identity of the evidence." *Id*. "Whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion of the trial court, and the court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion." *Holloman*, 835 S.W.2d at 46.

Defendant objected at trial to the introduction into evidence of the letter purportedly written by Defendant to his co-defendant Javoris Sparkman. Daryl Bailey, a corrections officer for the Maury County Sheriff's Department, testified that he found the letter in Mr. Sparkman's jail cell. He took possession of the letter and gave it to Detective Andy Jackson. Detective Andy Jackson testified that he received the letter from Daryl Bailey and hand-delivered the letter to the Columbia Police Department. Detective Jackson did not recall the name of the officer to whom he gave the letter, but he believed that he had given it to Detective Cash. Detective Jeremy Alsup testified that he was contacted by Detective Jackson on May 7, 2008, and he met Detective Jackson at the Maury County Sheriff's Office where he received the letter from him. On May 19, 2008, Detective Alsup sent the letter and a handwriting sample from the Defendant to the FBI lab for comparison. The letter was returned to him on July 17, 2008, and he hand-delivered it to the District Attorney General's office. Detective Alsup testified that it was returned to him that same day and he secured the documents in his case file.

Defendant points to Detective Jackson's testimony that he delivered the letter to Detective Cash and the inconsistent testimony of Detective Alsup that he received the letter from Detective Jackson. Detective Jackson testified:

> Q. And what did you do with the letter?
>
> A. I passed this along to the Columbia Police Department, detective's division.
>
> Q. And who did you give it to?
>
> A. I believe it was Detective Cash, I believe is who I passed it along to.
>
> Q. Are you sure?
>
> A. No, sir, not 100% of his name, I'm not.
>
> Q. Did you hand deliver it to them?

-16-

A.    Yes, sir, I did.

Q.    And where did you take it to?

A.    Well, actually he came to the Maury County Sheriff's Department and
      I passed it off to him there.

However, Detective Alsup testified that he picked the letter up from Detective Jackson at the Maury County Sheriff's Department. We do not believe that Detective Jackson's failure to specifically recall which detective to whom he delivered the letter is sufficient to break the chain of custody in this case. The trial court did not abuse its discretion in admitting the evidence.

Defendant also argues that an insufficient chain of custody was established for the bullet that was recovered from Sarah Garcia at the Williamson County Medical Center. Paramedic Michael Fletcher was working at the Williamson County Medical Center in the early morning hours of April 13, 2008. He testified that he assisted in the treatment of a female victim who was bleeding profusely from the upper mid-thigh of her left leg. In order to treat the victim's wound, her clothing was cut away. Mr. Fletcher testified that a small metal object that appeared to be a bullet fell out of her pants leg. Mr. Fletcher put the object inside a clean glove and handed it to Deputy Pewitt.

Deputy Brent Pewitt of the Williamson County Sheriff's Department testified that he was working as security at the hospital. He testified that EMS supervisor Fletcher handed him a glove containing the bullet. Deputy Pewitt kept the bullet in the glove and gave it to Franklin Police Sergeant Todd Stanford when he arrived. He testified that he was present when Sergeant Stanford gave it to Detective Cash from the Columbia Police Department.

Detective Michael Cash of the Columbia Police Department testified that was handed a rubber glove containing a bullet, which was inside a plastic bag. When asked who handed this to him, Detective Cash said, "I think it was Deputy Pewitt." Detective Cash put it in his jacket. He testified that he kept it in his possession all morning and never removed his jacket. He testified that he logged it into evidence at the Columbia Police Department. He put it inside an envelope, marked it with the date and time, recorded pertinent information about the item in the log book, and put the item in the metal lockbox.

Finally, Officer Orlando Cox of the Columbia Police Department testified that he took the bullet, as well as bullets and fragments recovered from other victims and a rifle recovered from the scene of the shooting, to the TBI crime lab in Nashville. The bullet was introduced into evidence through the testimony of TBI agent Steve Scott.

There is a discrepancy in the testimony, with Deputy Pewitt stating that he gave the bullet to Sergeant Stanford, and saw Sergeant Stanford give the bullet to Detective Cash, and Detective Cash testified that he thought he received the bullet from Deputy Pewitt. However, Deputy Pewitt testified that he and Sergeant Stanford "were together for the rest of the duration" after he gave Sergeant Stanford the bullet, and he saw Sergeant Stanford give the bullet to Detective Cash, who acknowledged receiving the bullet.

We are convinced the evidence is sufficient to establish the chain of custody for the bullet recovered from the victim Sarah Garcia. We find no error in the trial court's admission of the evidence. Defendant is not entitled to relief on this issue.

## VII. *Sufficiency of the indictments*

Defendant complains that the indictments for attempted first degree murder, Counts 5 through 13, should have been dismissed because they did not specifically allege attempt and failed to provide adequate notice that Defendant committed an overt act.

Counts 5 through 13 of the indictment charge that Defendant "unlawfully, knowingly, intentionally, deliberately and with premeditation [did] attempt to kill [the nine victims] in violation of Tennessee Code Annotated 39-12-101 and Tennessee Code Annotated 39-13-202 . . ."

Defendant also argues that the indictment fails to allege the specific manner of attempt, and asserts that this "error is compounded with respect [to] the jury instructions given . . . at trial." The trial court instructed the jury with respect to criminal attempt as provided in Tenn. Code Ann. section 39-12-101(a)(3):

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann § 39-12-101(a)(3).

The State responds that the indictment sufficiently notified Defendant that he was being charged with attempted first degree premeditated murder and relies on *State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999) and *Ruff v. State*, 978 S.W.2d 95 (Tenn. 1998), in which

the Tennessee Supreme Court held that specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense. Furthermore, the State points out that Defendant at no time requested a bill of particulars.

The Sixth and Fourteenth Amendments to the United States Constitution and Article I, section 9 of the Tennessee Constitution guarantee the accused the right to be informed of the "nature and cause of the accusation." Our supreme court has consistently interpreted this guarantee to require that an indictment: 1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy. *State v. Hill*, 954 S.W.2d 725 (Tenn. 1997). In *Wyatt v. State*, our supreme court concluded an indictment that identifies the offense, the victim, and the date of the offense against the victim accomplishes the notice requirements of *Hill.* 24 S.W.3d 319, 323 (Tenn. 2000).

The Tennessee Supreme Court has held that an indictment that specifically references the statute is sufficient. *See State v. Sledge*, 15 S.W.3d 93, 94 (Tenn. 2000) (an indictment omitting the offense name but referencing the statute was sufficient). This Court noted in *Blocker v. Worthington*, No. E2008-00881-CCA-R3-HC, 2009 WL 304022, *5 (Tenn. Crim. App. at Knoxville, Feb. 9, 2009), no. perm. app. filed, that an indictment for an attempted offense need not allege an overt act.

The indictments in this case were sufficient to put Defendant on notice that he was being charged with attempted first degree murder, to provide the court with an adequate basis upon which to enter a judgment, and to protect Defendant against double jeopardy. Defendant is not entitled to relief on this issue.

## VIII. *Criminal responsibility*

Defendant asserts that the trial court's instruction to the jury on criminal responsibility was improper based on a variance in the proof admitted at trial and the original charges and because the indictments did not charge criminal responsibility. Defendant submits that he was charged in the indictment as the "principal"; however, the proof at trial was that Defendant did not kill the victims or attempt to kill the victims. Defendant argues that the trial court effectively allowed the State to constructively amend the indictment to charge Defendant with criminal responsibility.

The State did not allege in the indictment that Defendant was guilty under a theory of criminal responsibility. Nevertheless, the State is not precluded from pursuing theories of criminal liability. Our supreme court has addressed the issue as follows:

-19-

[C]riminal responsibility is not a recognizable offense in itself, but is solely a theory by which the State may hold the defendant liable for the principal offense committed by another. *See* Tenn. Code Ann. § 39-11-402. An indictment that charges an accused on the principal offense "carries with it all the nuances of the offense," including criminal responsibility.

*State v. Lemacks*, 996 S.W.2d 166, 172 (Tenn. 1999) (quoting *State v. Lequire*, 634 S.W.2d 608, 615 (Tenn. Crim. App. 1981)).

We have already determined that the indictment was sufficient to provide adequate notice to Defendant of the crimes for which he was charged. This issue is without merit.

IX. *Consecutive sentencing*

Defendant next contends that the trial court erred by ordering that his sentences be served consecutively. Defendant was convicted of two counts of first degree murder and nine counts of attempted first degree murder, for which he received two life sentences and nine 15-year sentences, all to be served consecutive to each other.

A court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) [t]he defendant is an offender whose record of criminal activity is extensive;

(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances

-20-

arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). Furthermore, in the event the trial court finds defendant is a "dangerous offender," it must also determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

At the conclusion of the sentencing hearing in this case, the trial court found that Defendant was a dangerous offender and, as Defendant concedes, that he was on probation at the time of the offense. Defendant argues, however, that the trial court failed to make the additional finding pursuant to *Wilkerson*. The State argues that the trial court implicitly concluded that consecutive sentencing was necessary to protect the public from Defendant and reasonably related to the severity of the offenses. We agree. The trial court stated:

The Court is considering the circumstances of these crimes. And I know that [Defendant] has been in Court with this Judge, maybe two or three times, even prior to trial. And I was thinking before this trial began that this jury might be taken by the way he looks and how young he looks.

I changed my mind at trial, and particularly when you testified, [Defendant] and you had that smirk and that sneer on your face, which lasted throughout your testimony. I made several notations when you were giving your side of this case and portraying yourself as really a victim, who was not a shooter.

And you were grinning and smiling, throughout your testimony and that never changed. And when we have a person of the victim's family that comes in here and says, if my family can't see Juan's smile, then maybe your family your family shouldn't see you smile. And that hits home with me.

-21-

Because you, throughout this trial, throughout your testimony, throughout any hearing I've ever had you before me, and even today, show absolutely zero remorse.

And how you can sit here and hear the testimony of these victims families is beyond me, without showing some type of remorse. And I want the higher Courts to know that that has been nothing, zero.

And instead, you have had a smirk on your face from the beginning. And you showed this jury that same smirk and that sneer, smiling and grinning.

Insofar as your testimony when you say, had I know[n] there were females in this vehicle, maybe things would have been different. I find that to be untrue and incredible.

And here we are on a night where it was related to you, no first hand information, but related to you that somebody injured your grandfather, that all it took for you to put this in motion. And clearly, you were the person in control.

You might not have been the shooter, but you might as well have been, because you had that .38 on you when you were at the party. And you handed it to the killer in the vehicle. And you made sure that the SKS was handed to the other killer. And you gave the direction to kill.

And you didn't care who was in that vehicle. That didn't matter to you. There was no way – I am amazed that more people survived. They were ducking, but they couldn't escape. And we are lucky that only two of them died. But, you didn't care, nor do you care today.

* * * *

[Defendant] testified at trial that it was the officer's fault who made him, I suppose, say those words, "Light 'em up." He blames the officer, but he says, yes those are my words, but it's the officer's fault.

Now, I have a lot of trouble reconciling that testimony. And so you gave incredible, unbelievable testimony at this trial. You were in control from the time you stepped in the Armory. You had plenty of time to change your mind. There was a distance factor in traveling to where the killing took place.

-22-

Somebody was going to pay and you didn't care how many people were killed in that vehicle.

You ordered the execution. And so you are just as guilty as the shooters. And so you have no regard for human life, whatsoever.

Insofar as I need to discuss consecutive sentencing, [t]he Court finds that this defendant is a dangerous offender, who's [sic] behavior indicates no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

Even if the trial court erred by finding Defendant to be a "dangerous offender," as noted above Defendant concedes he was on probation at the time the offenses were committed, and the trial court found this to be an additional statutory factor which justified consecutive sentencing. Only one factor is necessary to permit consecutive sentencing. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995); Sent. Comm'n Cmts., T.C.A. § 40-35-115.

We conclude the trial court did not err in ordering the sentences to be served consecutively. Defendant is not entitled to relief on this issue.

X.      *Sufficiency of the evidence*

Defendant asserts that the evidence was insufficient to support his convictions. When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). We do not reweigh or reevaluate the evidence and are required to afford the state the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). It is the defendant's burden to show this court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Evaluation of witnesses' credibility, the weight and value to be given to the evidence, and resolution of factual issues raised by the evidence is left to the trier of fact. *Cabbage*, 571 S.W.2d at 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the state's witnesses, and a presumption of guilt replaces the presumption of innocence. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).

Defendant was convicted of two counts of first degree murder and two counts of felony murder. The felony murder convictions were merged into the first degree murder convictions. Defendant was also convicted of nine counts of attempted first degree murder. All of Defendant's convictions were based on the State's theory of criminal responsibility.

First degree murder is a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Intentional" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Whether premeditation existed in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *See State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Premeditation involves the defendant's state of mind which is often not susceptible to proof by direct evidence. Thus, premeditation may be proved by circumstantial evidence. *See State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

A person is criminally responsible as a party to an offense "if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *See State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003).

Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. *See id*. To be criminally responsible for the acts of another, the defendant must "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

A person commits criminal attempt who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part [or] . . . [a]cts with intent to complete a course of action or cause a result that

-24-

would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(2), (3).

Defendant asserts that his actions resulted from a state of passion and the evidence supports convictions for voluntary manslaughter and attempted voluntary manslaughter. Defendant argues that the proof "clearly showed that Defendant did not shoot anyone" and that he was "not in his right mind at the time of the shooting." We disagree.

The evidence established that Defendant and his co-defendants chased the victim's vehicle for several miles and fired upon it with a semi-automatic assault rifle and a handgun. There were eleven people in the victim's vehicle, at least one of which was a minor. Two of the victims died and at least three others were seriously injured. Defendant acted with the knowledge that an offense would be committed. A reasonable trier of fact could have inferred premeditation from the evidence that Defendant chased the victim's vehicle, produced two weapons and instructed his co-defendants to fire upon the unarmed victims.

In a light most favorable to the State, the evidence shows that Defendant drove the vehicle and followed the victims' vehicle because he believed that one of the victims had hit his grandfather at the party. Defendant sped up and pulled alongside the victims and told a co-defendant to retrieve an assault rifle from the trunk of Defendant's car. Defendant gave another co-defendant the handgun he had in his possession and instructed the co-defendants to fire upon the vehicle and "light 'em up." The evidence supports Defendant's convictions. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough and careful review of the record, we find no error in the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE